U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2012 OCT 18 PM 1: 01

CLERK
BY_____
DEPUTY CLERK

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 5:12-cr-52 |
| | ) | |
| RAYMOND SMITH | ) | |

## OPINION AND ORDER DENYING
## DEFENDANT'S MOTION TO SUPPRESS STATEMENTS
(Doc. 18)

This matter came before the court on September 17, 2012 for an evidentiary hearing on Defendant Raymond Smith's motion to suppress statements. (Doc. 18.) Defendant seeks suppression of all statements he made to law enforcement on March 21, 2012, first at his residence and later at a police station. Defendant is represented by Federal Public Defender Michael L. Desautels. The Government is represented by Assistant U. S. Attorney Nancy J. Creswell.

Defendant is charged in a one count indictment with knowingly employing, using, persuading, inducing, enticing and coercing a minor, E.T., age sixteen, to engage in sexually explicit conduct for the purpose of producing any visual depiction of such conduct, knowing and having reason to know that such visual depiction would be transported and was in fact transported in interstate commerce in violation of 18 U.S.C. § 2251(a).

## I.   Findings of Fact.

In March of 2012, Magistrate Judge John Conroy authorized a search warrant for the Defendant's residence as part of an investigation into an individual named Raymond Smith, his encounters with E.T., a sixteen-year-old female in Ohio, and the production of child pornography. In conjunction with the execution of the search warrant, law enforcement officers planned to identify Defendant as Raymond Smith, engage in a consensual interview with him if possible, and arrest him if they deemed there was

probable cause to do so. If Defendant was identified as Raymond Smith and refused entry to his residence, the agents planned to enter with or without his consent to execute the search warrant.

At approximately 8:00 a.m. on March 21, 2012, Special Agent Keith Saunders of the United States Secret Service and Detective Gregg Jager of the Chittenden Unit for Special Investigations ("CUSI") approached the Defendant's residence and knocked on the front door. At the time, the agents were wearing street clothes and carrying concealed firearms. The agents were aware that Defendant had previously been arrested on a felony sexual assault charge and thus had some experience with law enforcement. The agents were also aware that Raymond Smith was six feet tall, at least in his mid-fifties, had gray hair, and wore large glasses. Defendant, who matched the description of Raymond Smith, answered the door and permitted Special Agent Saunders and Detective Jager, who identified themselves, to enter his home. The agents did not advise Defendant that he was not under arrest, was free to leave or refuse to allow them to enter, or that approximately eleven additional law enforcement officers were parked in their vehicles out of sight, waiting to execute a search warrant.

The agents entered Defendant's small, two-level apartment and followed Defendant to the living room where he and Special Agent Saunders sat on the couch while Detective Jager remained standing. Defendant was not frisked at the time and the agents did not undertake a protective sweep of the apartment. Special Agent Saunders asked Defendant if he had made any trips to Ohio recently. After a long pause, Defendant asked if he could call an attorney to which Special Agent Saunders responded "Sure." Defendant picked up his cell phone, stood up, and appeared to be trying to call attorney Peter Langrock. Defendant asked the agents if he could use the bathroom and entered it unescorted while the agents remained in the living room. Defendant closed the bathroom door behind him. After a minute or two, the agents became concerned that there was a possibility of a weapon in the bathroom and that Defendant had possession of a cell phone that was the subject of the search warrant which, in turn, could result in the destruction of evidence. They approached the closed bathroom door and waited for

approximately one to two minutes. During this time, they did not hear the sound of a telephone call or any sounds of the use of the bathroom. Thereafter, one of the agents opened the bathroom door and Defendant was observed to be seated on the toilet with his pants around his ankles. He was holding his cell phone in front of his body and rapidly manipulating the phone with his hands. According to Special Agents Saunders, the expression on Defendant's face when they opened the door looked "caught" or "guilty." From Special Agent Saunders's vantage point outside the bathroom doorway, the face of the cell phone appeared to show images as opposed to text.[1]

Detective Jager asked Defendant for the cell phone and Defendant gave it to him. Special Agent Saunders told Defendant to pull up his pants and join them in the living room. Neither agent entered the bathroom or questioned Defendant until he returned to the living room. Special Agent Saunders and Defendant resumed their places on the living room couch. Special Agent Saunders offered his own cell phone to Defendant to call an attorney if he wished. Defendant declined the offer. Special Agent Saunders asked Defendant whether he would like to keep talking to the agents and Defendant answered that he would. The agents and Defendant then briefly discussed the case. Special Agent Saunders asked Defendant "Do you love her?" referring to E.T. Other than asking if Defendant had travelled to Ohio and whether he loved E.T., Special Agent Saunders does not recall asking Defendant any other specific questions.

Special Agent Saunders testified that the purpose of the agents' questioning in Defendant's residence was to identify Defendant and confirm his connection to the victim before taking him into custody. On cross examination, Special Agent Saunders admitted that Defendant's appearance matched the description the agents had been given of Raymond Smith, that simply asking Defendant his name would have confirmed his

---

[1] Forensic analysis of Defendant's cell phone revealed that he had in fact placed two calls to two different attorneys at Langrock Sperry & Wool, LLP. When Special Agent Saunders later asked him about his actions in the bathroom, Defendant stated that he was attempting to delete photographs of another girl, whom he claimed was nineteen.

identity, and that, from Special Agent Saunders's perspective, Defendant's identification as Raymond Smith would have provided probable cause to arrest him.

At the conclusion of their brief interview in Defendant's living room, Special Agent Saunders told Defendant for the first time that he and Detective Jager were accompanied by a team of law enforcement officers who were about to enter the apartment and execute a search warrant. Special Agent Saunders explained that he was going to take Defendant to a police station for photographing and fingerprinting and for a formal interview. Defendant was placed under arrest, handcuffed, and searched. As he left his residence, law enforcement officers were entering it to commence the search. Defendant was transported to the police station in the back seat of Special Agent Saunders's personal vehicle. There was no conversation en route.

There is no evidence that Defendant, while in his residence, was subjected to any threats, show of force, or physical restraints prior to his arrest. Defendant does not contend that he was tricked or deceived by the agents or promised leniency in exchange for his statements. Although the precise duration of the agents' interview in Defendant's residence was not provided to the court, in light of subsequent events, it appears to have lasted no more than forty-five minutes and presumably substantially less. The entire conversation took place in conversational tones and there is no evidence that Defendant at any time asked to stop the questioning or asked the officers to leave his residence.

At the police station, Defendant was photographed and fingerprinted. He then accompanied Special Agent Saunders and Detective Jager to an interview room. At approximately 8:45 a.m., Special Agent Saunders read Defendant his *Miranda* rights, using Secret Service form 1737B, labeled "Warning and Consent to Speak." (Doc. 25-1.)[2] Defendant waived his rights and signed the consent form. Special Agent Saunders and Detective Jager witnessed Defendant's signature.

---

[2] The form contains a "Warning of Rights" clause, a "Waiver" clause, and a "Certification" clause. (Doc. 25-1.) The Warning of Rights clause contains *Miranda* warnings and a signature line below the words "I have read this statement of my rights and it has been read to me, and I understand what my rights are." *Id.* The Waiver clause contains a signature line below the words:

4

Thereafter, Special Agent Saunders and Detective Jager interviewed Defendant "in much more detail," asking questions about his contacts with E.T., how they were made, whether Defendant made contact with other individuals, whether there were photographs taken of E.T. and others, and whether or not the photographs were distributed. Special Agent Saunders asked Defendant if he would like to offer his side of the story in his own words such that they would not be filtered through the agents. Defendant subsequently hand-wrote a statement on a form that contained the following pre-printed preface which Defendant supplemented with his name, the date, and Special Agent Saunders's name:

> I, **Raymond Smith**, have sworn to tell the truth in this statement on this date, [**March 21, 2012**]. I offer this statement so that the facts might be known.
>
> I have been advised by Special Agent **Keith Saunders** that I have the right to remain silent; that anything I say can be used against me in court or other proceeding; that I have a right to talk to a lawyer and have him present while I am being questioned; and that, if I cannot afford a lawyer and want one, one will be appointed for me. I can decide to stop the questioning at any time. I understand these rights and I am willing to answer questions and make a statement. I do not want a lawyer at this time and I understand and know what I am doing. No promises or threats have been made to me and no pressures of any kind have been used against me. I am making the following statement freely and voluntarily.

(Doc 25-2 at 1.) Defendant's hand-written statement contains incriminating evidence.

Special Agent Saunders continued the questioning of Defendant at the police station in a conversational tone. There is no evidence that Defendant was subjected to threats, trickery, coercion, or a show of force at the police station. Special Agent

---

> I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or force of any kind has been used against me. I hereby voluntarily and intentionally waive my right to remain silent and my right to have an attorney at this time. I am willing to make a statement and answer questions.

*Id.* The Certification clause states "I hereby certify that the foregoing Warning of Rights and Waiver were read by me to the above signatory, and that he also read it and has affixed his signature hereto in my presence." *Id.*

5

Saunders denies that the agents engaged in a deliberate two-step process to undermine Defendant's *Miranda* rights. Instead, he contends that the plan was to attempt interview Defendant on a consensual basis in his residence to confirm Defendant's identity to ensure probable cause to arrest him, and then to follow any such consensual interview upon Defendant's arrest with a formal interview at a police station accompanied by *Miranda* warnings.

## II. Conclusions of Law and Analysis.

Defendant seeks suppression of the statements he made at his residence on the grounds that they were made in response to custodial interrogation without the benefit of *Miranda* warnings. Defendant seeks suppression of his post-*Miranda* statements he made at the police station on the grounds that he had previously invoked his right to counsel and did not reinitiate further discussions. He seeks suppression of those statements on the further grounds that the interrogation at the police station was part of a deliberate and impermissible two-step interrogation process calculated to undermine his *Miranda* rights.

The Government opposes suppression, contending that Defendant was not in custody when questioned at his residence, did not unequivocally invoke his right to counsel, and was not subject to a deliberate two-step interrogation process.

### A. Defendant's Statements at His Residence.

The parties agree that Defendant was interrogated by the agents in his residence. Therefore, the only issue is whether Defendant was in custody when he was questioned in his living room. Courts generally hold that a criminal defendant bears the burden of establishing that he or she was subjected to custodial interrogation.[3] The test for

---

[3] *See United States v. Jorgensen*, 871 F.2d 725, 729 (8th Cir. 1989) (affirming district court's dismissal of defendant's *Miranda* claim because defendant "failed to demonstrate that he was subjected to custodial interrogation"); *United States v. Lawrence*, 1989 WL 153161, at *5 (6th Cir. Dec. 18, 1989) (table)(unpublished) (holding that when a defendant seeks to suppress statements on the basis that he was not given *Miranda* warnings, he has the burden of proving by the preponderance of the evidence that he was subjected to custodial interrogation); *United States v. Davis*, 792 F.2d 1299, 1308 (5th Cir. 1986) (noting that defendant "had the burden of proving that he was under arrest or in custody" when seeking to suppress statements); *United*

6

"whether a suspect is 'in custody' is an objective inquiry," *J.D.B. v. North Carolina*, 131 S. Ct. 2394, 2402 (2011), made after examining "all of the circumstances surrounding the interrogation." *Id.* (quoting *Stansbury v. California*, 511 U.S. 318, 322 (1994)).

A court should "begin any custody analysis by asking whether a reasonable person would have thought he was free to leave the police encounter at issue. If the answer is yes, the *Miranda* inquiry is at an end; the challenged interrogation did not require advice of rights." *United States v. Newton*, 369 F.3d 659, 672 (2d Cir. 2004). "On the other hand, if a reasonable person would not have thought himself free to leave," the "court must ask whether, in addition to not feeling free to leave, a reasonable person would have understood his freedom of action to have been curtailed to a degree associated with formal arrest." *Id.* at 672.[4] "Only if the answer to this second question is yes was the person 'in custody[.]'" *Id.* (quoting *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984)).

The Second Circuit has held that "[t]he free-to-leave inquiry constitutes a necessary, but not determinative, first step in establishing *Miranda* custody." *Newton*, 369 F.3d at 670. In doing so, it acknowledged that in *Berkemer v. McCarty*, 468 U.S. 420 (1984), the United States Supreme Court concluded that although motorists subject to routine traffic stops would generally not feel "free to leave" the scene of the stop, they were not in custody for purposes of *Miranda*. *Newton*, 369 F.3d at 669 (citing *Berkemer*, 468 U.S. at 436).[5] For this reason, "[t]he ultimate inquiry for determining *Miranda*

---

*States v. Shteyman*, 2011 WL 2006291, at *14 (E.D.N.Y. May 23, 2011) ("The Court notes that on a motion to suppress statements, it is the defendant who bears the burden of demonstrating that he was subject to custodial interrogation."); *United States v. Artis*, 2010 WL 3767723, at *4 (D. Vt. Sept. 16, 2010) ("The weight of authority appears to hold that a defendant bears the burden of establishing that he or she was subjected to custodial interrogation in order to establish a constitutional violation as the basis for suppression of evidence.").

[4] This is because the "free-to-leave inquiry reveals only whether the person questioned was seized," and "not every seizure constitutes custody for purposes of *Miranda*." *Newton*, 369 F.3d at 672.

[5] The Second Circuit nonetheless distinguished an investigatory stop from custodial interrogation and "rejected Fourth Amendment reasonableness as the standard for resolving *Miranda* custody challenges." *Newton*, 369 F.3d at 673.

custody is . . . whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Newton*, 369 F.3d at 670 (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (per curiam) (quotation omitted)).

Examining the totality of the circumstances in this case, Defendant was confronted in the early morning hours by two federal agents who asked to speak to him inside his residence. In making this request, the agents did not advise Defendant that he was free to refuse an interview or advise him that he was not under arrest. Defendant permitted the agents to enter his residence and led them to a living room area where he sat on the couch with one agent while another agent remained standing. The agents were in plain clothes with concealed firearms and engaged in no coercive tactics, intimidation, or show of force to foster Defendant's cooperation or induce him to speak against his will.

Although it is possible for a suspect to be in custody in his or her own home,[6] courts generally find that interrogation in such familiar surroundings is not custodial in nature. *See United States v. Cunningham*, 2012 WL 369923, at *4 (D. Vt. Feb. 3, 2012) (citing *United States v. Rakowski*, 714 F. Supp. 1324, 1334 (D. Vt. 1987) ("Lower courts . . . almost universally hold that questioning in a suspect's home is not custodial because individuals in a familiar environment are less likely to be intimidated by law enforcement officers.") (collecting cases)); *see also United States v. Bassignani*, 575 F.3d 879, 885 (9th Cir. 2009) ("We have held that an interrogation conducted in familiar surroundings weighs against a finding that defendant was in custody."). Defendant thus faces a considerable challenge in establishing that he was in custody while seated without handcuffs or other physical restraints on his living room couch.

Shortly upon entering Defendant's residence, Special Agent Saunders asked Defendant whether he had recently made any trips to Ohio. Defendant apparently immediately recognized this question as calling for incriminating evidence and asked for permission to call an attorney, thereby revealing that he did not feel completely unrestrained in his actions in the presence of the agents. He also asked to use his own

---

[6] *See Newton*, 369 F.3d at 672 (finding that a suspect was in custody at his home because officers placed him in handcuffs).

8

bathroom. The agents' responses to these questions, however, revealed no immediate effort to control Defendant's actions or movements. Defendant was allowed to use his cell phone and proceeded to the bathroom unescorted, closing the door behind him. These are not the actions of someone whose freedom is restrained commensurate with an arrest. Indeed, suspects have been held not to be in custody in circumstances involving far greater restriction of movement than in the instant case. *See, e.g., United States v. Groezinger*, 625 F. Supp. 2d 145, 151 (S.D.N.Y. 2009) (defendant not in custody when he was told by officers conducting a search that he was not under arrest, but subsequently forced to sit in his kitchen for an hour and a half, during which time he "got up once or twice and was told to sit down" and was told "he was going to be late" after informing the officers that he was expected at a meeting); *United States v. Badmus*, 325 F.3d 133, 138-139 (2d Cir. 2003) (suspects not in custody even though they were asked to stay seated in the living room and were not allowed to move freely about their home as six officers searched the small apartment for nearly three hours).

When the agents became concerned that Defendant might be accessing a weapon or destroying evidence, they opened the bathroom door and surprised Defendant as he sat partially unclothed on the toilet manipulating his cell phone. Defendant was instructed to turn over the phone, pull up his pants, and join the agents in the living room. Again, this evidenced some control by the agents over Defendant's freedom of movement.[7] These commands, however, were immediately counterbalanced by Special Agent Saunders's offer to Defendant to use Agent Saunders's cell phone for purposes of contacting an

---

[7] Even in the absence of a search warrant, courts recognize that it is objectively reasonable under the Fourth Amendment for law enforcement to intervene when the "exigency is the need to prevent the imminent destruction of evidence." *United States v. Simmons*, 661 F.3d 151, 157 (2d Cir. 2011) (citing *Kentucky v. King*, 131 S. Ct. 1849, 1856 (2011) ("[T]he need to 'prevent the imminent destruction of evidence' has long been recognized as a sufficient justification for a warrantless search.") (citation omitted); *In re Terrorist Bombings of U.S. Embassies in E. Africa*, 552 F.3d 157, 168 (2d Cir. 2008) ("Familiar exceptions to the warrant requirement arise from exigent circumstances, such as the risk of imminent destruction of evidence[.]"). Here, in conjunction with their investigation of Defendant's alleged production of child pornography, it was objectively reasonable for the agents to restrict Defendant's access to a cell phone from which he appeared to be deleting images. The fact that a warrant authorized the search and seizure of the cell phone in question only underscores that conclusion.

attorney and their further inquiry regarding whether Defendant wanted to continue talking to them. A reasonable person in Defendant's position would understand these offers as inviting Defendant to decide for himself, with or without the advice of counsel, whether he wanted the interview to continue. This factor weighs in favor of finding the interview non-custodial. *See Thomas v. Keohane*, 516 U.S. 99, 112 (1995) (custodial interrogation inquiry is focused on whether in light of totality of circumstances, "a reasonable person would have felt he or she was not at liberty to terminate the interrogation and leave.").

In this case, the freedom to leave inquiry is further complicated by the fact that the interview took place in Defendant's own home. Although the agents did not advise Defendant that he was free to leave his residence (and perhaps he was not), Defendant cannot claim their failure to do so was somehow coercive as there would be little sense in the agents advising Defendant that he could leave his own home while they remained in his living room. Of course, the agents could have underscored the consensual nature of the interview by offering Defendant the opportunity to ask them to leave. Since they intended to arrest Defendant after they confirmed his identity, it was unlikely such offer would be forthcoming. Instead, while controlling some of the Defendant's actions, they asked Defendant for permission to enter his residence, allowed him to move about his residence unescorted, and asked for permission to continue speaking to him. Whether a reasonable person in Defendant's position would actually feel free to leave his own residence during questioning or to ask the agents to leave thus presents a close question. When the questioning occurs at a place other than a police station, "*Miranda* is *not* triggered simply because a person detained by the police has reasonable cause to believe he that he is not free to leave." *United States v. Streifel*, 781 F.2d 953, 961 (1st Cir. 1986). "Decisions in [the Second Circuit] have emphasized that in the absence of actual arrest, an interrogation is not 'custodial' unless the authorities affirmatively convey the message that the defendant is not free to leave." *United States v. Mitchell*, 966 F.2d 92, 98 (2d Cir. 1992). Here, no such message was conveyed and as the subject of Defendant's leaving or the agents leaving the residence was never raised, the facts do not

support a conclusion that the failure to advise Defendant that he was not under arrest and was free to leave rendered the interrogation custodial. *See U.S. v. Benedict*, 104 F. Supp. 2d 175, 179 (W.D.N.Y. 2000) ("Defendant's argument that no one told [him] that he was free to leave is specious . . . no one told him that he could not leave.").

Thereafter, in response to Defendant's agreement to continue the interview, the agents did not subject Defendant to a "marathon session designed to force a confession." *Cunningham*, 2012 WL 369923, at *5 (quoting *Davis v. Allsbrooks*, 778 F.2d 168, 171 (4th Cir. 1985)). To the contrary, the entire conversation lasted a matter of minutes, was conversational in tone, and only touched on general aspects of the investigation rather than on specifics. *See U.S. v. Lifshitz*, 2004 WL 2072468, at *8 (S.D.N.Y. Sept. 15, 2004) (finding that an interview that "was not overly long-lasting approximately 45 minutes to one hour" was non-custodial).

At no time during the interview in Defendant's residence did the agents convey to Defendant that his cell phone was the subject of a search warrant or that they intended to arrest him. Accordingly, Defendant cannot rely on the agents' intent to establish that he was in custody. Undisclosed, "'subjective views harbored by either the interrogating officers or the person being questioned' are irrelevant." *J.D.B.*, 131 S. Ct. at 2402 (quoting *Stansbury*, 511 U.S. at 323); *see also Berkemer*, 468 U.S. at 442 (holding that a defendant was not in custody prior to his formal arrest, even though the investigating officer had privately decided to take him into custody, because the officer did not communicate this decision and "[a] policeman's unarticulated plan has no bearing on the question whether a suspect was 'in custody' at a particular time"); *Lifshitz*, 2004 WL 2072468, at *8-9 (finding no custody during an interview in the defendant's home even though he was arrested soon afterwards when a consented-to search of his computer revealed child pornography).

In summary, courts have held that "to find *Miranda* custody" without signs of "external restraints," such as being placed in handcuffs, "it must be very clear that the suspect is being detained; in spite of the ostensible freedom, the suspect's "movements [must be] totally under the control of the police." *United States v. Molodtsova*, 2010 WL

723688, at *6 (D. Vt. Feb. 25, 2010). Here, based upon the totality of circumstances, Defendant has not established that while in his residence his freedom of movement was under the total control of the agents or that "a reasonable person would have understood his freedom of action to have been curtailed to a degree associated with formal arrest." *Newton*, 369 F.3d at 672. Accordingly, Defendant was not entitled to *Miranda* warnings prior to being questioned in his residence and his motion to suppress on this ground must be DENIED.

### B.   Defendant's Invocation of the Right to Counsel.

Defendant seeks suppression of his statements at his residence and at the police station on the further grounds that they resulted from law enforcement initiated questioning after he had unequivocally invoked his right to counsel. The Government argues that Defendant was not in custody when he allegedly invoked his right to counsel and further argues that any invocation of counsel was equivocal and therefore ineffective.

The court need not decide whether Defendant's request was unequivocal because Defendant was not in custody when he asked to call an attorney. In *McNeil v. Wisconsin*, the Supreme Court first expressed doubt that "a person can invoke his *Miranda* rights anticipatorily," noting that "[t]he fact that we have allowed the *Miranda* right to counsel, once asserted, to be effective with respect to future custodial interrogation does not necessarily mean that we will allow it to be asserted initially outside the context of custodial interrogation, with similar future effect." *McNeil v. Wisconsin*, 501 U.S. 171, 182 n.3 (1991). The Second Circuit has adopted the *McNeil* Court's rationale, holding that a defendant can only invoke the Fifth Amendment right to counsel once it attaches in the context of custodial interrogation. *See Thompson*, 35 F.3d at 104 (citing *McNeil*, 501 U.S. at 177-82); *see also United States v. Allen*, 169 F. App'x 634, 636-37 (2d Cir. 2006) (citing *McNeil*, 501 U.S. at 182 n.3). At least seven other circuits have applied *McNeil* in circumstances analogous to this case and have held that a defendant may not invoke his right to counsel prior to custodial interrogation and rely on that invocation thereafter.[8]

---

[8] *See, e.g., United States v. Ellison*, 632 F.3d 727, 731 (1st Cir. 2010) (noting that even if the defendant "had clearly expressed a desire to speak with a lawyer, he could not have invoked any

12

Accordingly, because any invocation of the right to counsel occurred when Defendant was not in custody, and because the Second Circuit has held there is no right to an anticipatory invocation of counsel such that any subsequent custodial interrogation would be subject to it, Defendant's motion to suppress on this ground must also be DENIED.

### C. Whether the Officers Pursued a Deliberate Two-Step Interrogation.

Finally, Defendant seeks suppression of his statements at the police station on the grounds that he was subject to a deliberate two-step interrogation process designed to undermine his *Miranda* rights. In essence, Defendant argues that the agents violated his *Miranda* rights by not providing him with *Miranda* warnings prior to questioning him at his residence and then sought to take advantage of that impermissible questioning by subsequently advising him of his *Miranda* rights, securing a waiver, and obtaining a full confession. The Government maintains there was no custodial interrogation in Defendant's residence and there was no deliberate two-step process.

In *Missouri v. Seibert*, 542 U.S. 600 (2004), the Court addressed whether law enforcement officers had engaged in a deliberate two-step strategy to circumvent *Miranda* by first interrogating a suspect without *Miranda* warnings until she gave a full confession and then, after brief hiatus in the questioning, administering *Miranda* warnings and obtaining a second confession. The Court held that the post-warning

---

constitutional right to do that in a non-custodial interrogation"); *Brosius v. Warden, U.S. Penitentiary, Lewisburg, Pa.*, 278 F.3d 239, 249 (3d Cir. 2002) ("*Edwards* applies only where the suspect makes a request for counsel while in custody."); *Burket v. Angelone*, 208 F.3d 172, 197 (4th Cir. 2000) (holding that when a defendant "was neither arrested, nor was his freedom of action curtailed to a degree associated with arrest[,]" he "could not invoke the protections provided by *Miranda*"); *United States v. Wyatt*, 179 F.3d 532, 537 (7th Cir. 1999) ("The Fifth Amendment right to counsel safeguarded by *Miranda* cannot be invoked when a suspect is not in custody[.]"); *United States v. Bautista*, 145 F.3d 1140, 1147 (10th Cir. 1998) (noting that "in order to implicate the *Miranda-Edwards* right to counsel prophylaxis, both a custodial situation and official interrogation are required"); *United States v. Wright*, 962 F.2d 953, 955 (9th Cir. 1992) ("*McNeil* strongly suggests that *Miranda* rights may not be invoked in advance outside the custodial context."); *Tukes v. Dugger*, 911 F.2d 508, 515 (11th Cir. 1990) ("The requirement that the prisoner's invocation of the right to counsel cause the cessation of questioning stems from the nature of custody. Where the prisoner is not in custody, the *Edwards* . . . concerns are not triggered[.]").

statements should be suppressed, with a plurality concluding that the post-warning statements should be suppressed because the officers' two-step strategy rendered the *Miranda* warnings ineffective. The plurality found five objective factors relevant to the inquiry: (1) "the completeness and detail of the questions and answers in the first round of interrogation;" (2) "the overlapping content of the two statements;" (3) "the timing and setting of the first and second" interrogations; (4) "the continuity of police personnel" doing the questioning; and (5) "the degree to which the interrogator's questions treated the second round as continuous with the first." *Seibert*, 542 U.S. at 611-12 (plurality opinion).

Justice Kennedy supplied the fifth vote for suppression in *Seibert*, but disagreed with the plurality's reasoning, arguing that "an objective inquiry from the perspective of the suspect [that] applies in the case of both intentional and unintentional two-stage interrogations . . . cuts too broadly." *Id.* at 621-22 (Kennedy, J., concurring). He noted that law enforcement may be faced with circumstances in which "[a]n officer may not realize that a suspect is in custody and warnings are required" and argued that in such circumstances "it would be extravagant to treat the presence of one statement that cannot be admitted under *Miranda* as sufficient reason to prohibit subsequent statements preceded by a proper warning." *Id.* at 620. He concluded that whether the statements were voluntary should be the linchpin unless a "*deliberate* two-step strategy was employed," in which case "postwarning statements that are related to the substance of prewarning statements must be excluded unless curative measures[,]" such as "a substantial break in time and circumstances" or "an additional warning that explains the likely inadmissibility of the prewarning custodial statement[,]" are "taken before the postwarning statement is made." *Id.* at 622.

The Second Circuit has held that "Justice Kennedy's concurrence in *Seibert* is controlling" and "the prosecution bears the burden of disproving by a preponderance of the evidence that the government employed a deliberate two-step strategy to deprive the defendant of the protections afforded by the Fifth Amendment." *United States v. Moore*, 670 F.3d 222, 229 (2d Cir. 2012). In engaging in this inquiry, "a court should review the

14

totality of the objective and subjective evidence surrounding the interrogations in order to determine deliberateness." *United States v. Williams*, 681 F.3d 35, 41 (2d Cir. 2012) (quoting *United States v. Capers*, 627 F.3d 470, 479 (2d Cir. 2010)).

As the threshold for any *Seibert* inquiry, the Second Circuit has required a "straightforward analysis" asking "[f]irst, was the initial statement, though voluntary, obtained in violation of the defendant's *Miranda* rights? If not, there is no need to go further." *See Moore*, 670 F.3d at 229 (citing *United States v. Courtney*, 463 F.3d 333, 336 (5th Cir. 2006)); *see also United States v. Ferguson*, 2011 WL 1347002, at *7 (S.D.N.Y. Apr. 4, 2011) ("Because the initial non-*Mirandized* questioning . . . was not illegal, it is unnecessary for the Court to address the defense's further arguments as to whether there was improper 'two-step' questioning that would preclude the admission of his additional, post-Miranda statements to authorities.").

In this case, the court has concluded that Defendant was not subjected to custodial interrogation in his residence and as a result any statements he made there were not obtained in violation of his *Miranda* rights. Accordingly, the court need not proceed further with a *Seibert* analysis. For purposes of facilitating appellate review, the court nonetheless finds no subjective intent by the agents to employ a deliberate two-step process,[9] notes that the two interviews differed significantly in scope, content, and

---

[9] A court may consider a law enforcement officer's testimony regarding his or her subjective intent. *See Williams*, 681 F.3d at 43; *Moore*, 670 F.3d at 229; *Capers*, 627 F.3d at 482. Courts should engage in "a somewhat closer scrutiny of an investigator's testimony of subjective intent when the proffered rationale is not a 'legitimate' reason to delay or where it 'inherently lacks credibility' in view of the 'totality of the circumstances[,]'" *Moore*, 670 F.3d at 229 (quoting *Capers*, 627 F.3d at 484 n.5). However, "if it is found, after weighing the investigator's credibility, that the investigator's intent was not 'calculated . . . to undermine *Miranda*,' delay will not require exclusion of the later, warned statement even if the court finds that the delay was for an illegitimate reason[.]" *Moore*, 670 F.3d at 229 (quoting *Capers*, 627 F.3d at 482). If the investigating officer testifies credibly that there was no intent to undermine *Miranda*, a court should not exclude the post-warning statements "absent objective evidence of such an intention." *Williams*, 681 F.3d at 43. Here, the court finds Special Agent Saunders testified credibly that his intent was to engage in a consensual interview of Defendant in his residence to confirm his identity and contacts with E.T. to be followed with a more formal interview preceded by *Miranda* warnings upon Defendant's arrest.

15

duration, and occurred in two markedly different settings, and finds that both sets of statements were voluntarily made with the written confession at the police station preceded by two forms of *Miranda* warnings. As a result, although there was a continuity in police personnel and only a brief hiatus between the two interviews, there is no evidence to support a conclusion that the agents deliberately sought to violate Defendant's *Miranda* rights at his residence so that they could thereafter take advantage of that violation in securing a *Miranda* waiver and subsequent confession at the police station. Defendant's motion to suppress based upon a deliberate two-step process to undermine his *Miranda* rights is therefore DENIED.

## CONCLUSION

For the foregoing reasons, Defendant's Motion to Suppress (Doc. 18) is DENIED. SO ORDERED.

Dated at Rutland, in the District of Vermont, this 18th day of October, 2012.

Christina Reiss, Chief Judge
United States District Court